# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITES STATES OF AMERICA )
          Plaintiff )
           )
      -v- ) Docket No. 0208 1:10cr00948-001 (KTD)
           )
           )
SUZANNE SEGGERMAN )
          Defendant )

## MEMORANDUM ON BEHALF OF SUZANNE SEGGERMAN
## IN AID OF SENTENCING

Attorney for the Defendant
Russell M. Gioiella
Litman, Asche & Gioiella, LLP
140 Broadway, 38th Floor
New York, New York 10005
212.809.4500
rmg@lagnyc.com

Date: September 4, 2014

# I.
## INTRODUCTION

This Sentencing Memorandum is respectfully submitted on behalf of Suzanne Seggerman who is scheduled to be sentenced by the Court on September 9, upon her plea of guilty to one count of conspiracy to defraud the U.S. Internal Revenue Service pursuant to 18 U.S.C. §371 and two counts of subscribing to an individual false tax return pursuant to 26 U.S.C. §7206(1). We respectfully request that the court sentence Ms. Seggerman to a term of probation with special conditions of community service. We note that the Presentence Investigation report also recommends a sentence of probation, and we concur in its recommendation and the reasons set forth therein.

This memorandum will set forth the reasons for our suggestion, which arises out of what we consider an appropriate application of the sentencing factors under 18 U.S.C. §3553(a), especially recognizing:

i)   that the instant offense is an aberration in an otherwise law-abiding and productive life;

ii)  that, as demonstrated in the attached, voluminous letters, Ms. Seggerman has devoted her life to helping others, to trying to make the world a better place, to enhancing the well-being of those around her, and to providing her family with love and concern that is exceptional;

iii) that almost immediately upon learning she was under investigation, Ms. Seggerman promptly decided to admit her involvement in the crime, accept full responsibility for her conduct, and do everything possible to cooperate fully and truthfully in the government's investigation, leading, among other things, to three guilty pleas and the indictment of an attorney who is awaiting trial on tax and conspiracy charges; and

iv)  that since this case began, she has suffered a great deal already – she has lost much of her family owing to her cooperation against them, lost her career, and she has lived under an enormous cloud

of uncertainty regarding her own life and what life will be like for her 13-year-old daughter once she is sentenced.

Ms. Seggerman has filed amended tax returns and paid all sums due and owing to the state and federal government.[1] She has also paid the penalty prescribed in her plea agreement for failing to report the Swiss account at issue on the "FBAR" form. She also faces liability for unpaid estate taxes in an unknown amount. There is no doubt that Ms. Seggerman will not profit from her crime in any respect; rather, she may well become insolvent.

Further, as we note below, the need to avoid unwarranted disparities among similar offenders argues forcefully for a sentence of probation with community service conditions. As the attached data demonstrates graphically, even without cooperation, the great majority of similar offenders received a sentence of probation or confinement of less than six months. Here, the factors leading to those sentences are fortified by Ms. Seggerman's extraordinary cooperation and stellar personal history.

Finally, Ms. Seggerman's husband currently lives and works in Kenya. After many years working as the Director of Communications for the Secretary General of the United Nations and then the UN Mission in Darfur, Mr. Meyer was forced to leave the United Nations due to the possibility of future age restrictions. As he has ongoing obligations to care for his disabled son from his first marriage, he chose to take gainful employment elsewhere. He therefore accepted a position to start a journalism school in

---

[1] The amended PSI erroneously states at paragraph 26 that the unpaid taxes on the Ms. Seggerman's interest income earned by the overseas account amounted to $5,164,873. In fact, the unpaid taxes on Ms. Seggerman's interest income was $51,473 in the aggregate for all years during which the account existed. The overwhelming majority of the tax loss underlying the guidelines range, specifically $5,164,873, relates to the failure of the family members to include the offshore monies on the estate tax return.

Kenya. Last year, Ms. Seggerman and her daughter Tatiana, who is only 13 years old, also lived in Kenya, and Tatiana attended school there. This year, because of the pendency of sentence and the dangerous security situation in Kenya, Ms. Seggerman has enrolled Tatiana in school in New York, as Kenya would not have been a safe place for Tatiana without the full-time presence of Ms. Seggerman. If Ms. Seggerman were to receive a custodial sentence, there would be no family here to take care of Tatiana, as she would not be able to return to Kenya, and her father would not be able to give up his employment and move back to New York.

## II.
### PERSONAL HISTORY

Suzanne Seggerman was born on August 13th in New York City. She was the fifth of six children. Her older sister, Patricia, was diagnosed with cancer when Suzanne was a toddler, and the family was thrown into a great deal of pain and chaos. Patricia had cancer of the leg, then had her leg amputated above the knee. While in the hospital recuperating from that surgery, she became catatonic and was subsequently diagnosed as schizophrenic. Because of the intensity of Patricia's needs, and the demands on their mother, the family environment was chaotic. Their father, Harry Seggerman, worked long hours, returning late and traveling often. Suzanne and John (her younger brother by 10 months) were usually cared for by nannies.

Ms. Seggerman attended Kenyon College and graduated with Bachelor of Arts degree in French Philosophy in 1984. Her first job was at an ad agency, Doremus Boston, and it was this position that put her on her lifetime track of focusing on non-profit and public service endeavors. She spent a lot of her time and passion organizing several events for Amnesty International, a human rights group. She solicited the help of some of

4

the advertising agency staff to contribute their time to assist with her efforts as well. One of her events became one of the most successful Amnesty International benefits created by a volunteer.

She soon left advertising to take a job that felt more "meaningful" — it became apparent from that moment on that Ms. Seggerman was only interested in work that felt like it was making a positive contribution to the world. Her non-profit and public service experiences then began in earnest.

Interested in the issues of the Cold War, Ms. Seggerman moved in 1990 to newly liberated Czechoslovakia, and from there she had an impact. She taught at the country's primary university, Charles University, conveying in lessons what for these students were new ideas of democracy, freedom of thought and religion. She co-produced a documentary and humanitarian aid called "Race for Life," which tracked a local running team as it traveled through Western Europe to procure medical supplies aimed at helping treat infants whose mothers lacked proper pre-natal care under Communist rule and who had been born with defects. She taught a student who was a leader against communism and who went on to become an influential Member of Parliament, with a lasting effect on the success of his country.[2]

While Ms. Seggerman was living overseas, her father became ill, and she returned to the United States to help care for him. She lived with her parents for several months supporting them in their efforts to seek ongoing treatment and rehabilitation for her father. Later that year, she moved to New York City and soon afterwards started work on

---

[2]     Exhibit A. The exhibits of this Memorandum are being ECF filed as three documents. When providing your Honor with a copy, the exhibits will be separated by tabs.

the Ken Burns/Stephen Ives PBS series, *The West*. It was during this period that she became interested in the early internet, especially in its potential as a new medium for more serious issues. Soon afterwards, she attended graduate school at NYU for a master's degree in interactive telecommunications, or "new media" in order to pursue a vision of a new platform where many voices could be heard and opinions shared.

At NYU's new media lab, ITP, from 1996-1997, Suzanne pursued the use of the early internet and game technology to advance positive social change. After finishing school, she went to work for a think tank, Web Lab, which had grown out of the independent PBS series, *POV*. She worked there as manager and director of a variety of projects, specifically pro-social uses of the web for such subjects as suicide prevention, adoption, and breast cancer survival.

While at Web Lab, Suzanne met her future husband, Michael Meyer. Mr. Meyer was working as the technology editor of Newsweek at the time, and they met at a journalists gathering. As they dated, Ms. Seggerman came to understand that in committing to Mr. Meyer, she would be taking on the responsibility of a stepmother to his three children, including a severely handicapped son who was on life support because of a heart defect. But from the start, she welcomed his children as her own.

Mr. Meyer accepted a temporary assignment from the United Nations mission in Kosovo to start a news agency as part of the massive nation-building efforts from the international community after the NATO conflict liberated the Kosovars from Serbian rule. Ms. Seggerman joined him in the move to Kosovo, leaving her job at Web Lab.

Soon after, Tatiana Meyer was born on December 6, 2000 in the American Hospital in Paris. Mike, Suzanne and Tatiana moved back to New York a month later in

6

January 2001, and Suzanne resumed work with Web Lab a few months after that.  In May of 2001, Suzanne's father died, beginning the cascade of events that led to this case.

Suzanne continued to work with Web Lab full and part time for the next several years, pursuing the use of the internet to explore social and personal issues, including offering an online platform for families stricken by suicide and, after September 11, to families affected by the terror attack.

In 2004, with two others, she founded Games for Change (G4C). The concept of G4C was to explore ways to harness the power of game technology to be used for the public good, especially in youth education. Ms. Seggerman ran Games for Change, first with the help of Ben Stokes from 2004 - 2006, then on her own from 2006 - 2010. During the first two years, she worked for no pay. We will discuss G4C in great detail below.

This was a time of tremendous happiness and success for Ms. Seggerman and her family: her young daughter was flourishing at school, her husband had a job that he loved working for the Secretary General of the United Nations, and the extended family was coming together regularly at their home in Maryland and elsewhere. She was finding success with her long-term dream of changing the world for the better by making new kinds of video games to engage young people in more serious matters.

That all changed in an instant. In December of 2009, Suzanne received a subpoena from the government regarding her Swiss account.  She quickly decided to admit her guilt and cooperate in the government investigation.  As result, she was required to provide information on her family members, who at the time themselves declined to cooperate, as well as others.  She knew that she would soon be a convicted felon and face the prospect of possible incarceration.

In addition to suffering the onerous consequences that her conduct had caused to her immediate family, she did not want her conduct to damage Games for Change. So to avoid potential damage to the reputation of the organization, Suzanne decided to step down from her leadership at Games for Change, which for her was devastating. She then found it difficult to find a job due to the conviction and pendency of sentence. For example, she spent the better part of a year building a start-up, but a budding partnership fell through when the news of her past became known. She was even turned down by a temp agency that specialized in non-profits. As the letters discussed below demonstrate, despite her inability to find permanent employment, Ms. Seggerman has continued in her charitable endeavors.

In 2013, Mr. Meyer left his position with the United Nations and accepted a position to form a school for journalism in Nairobi, Kenya. Ms. Seggerman and their daughter Tatiana accompanied him and lived there for a year, though she has moved back to New York for sentence.

### III.
### ANALYSIS OF SENTENCING FACTORS

18 U.S.C. §3553(a) provides, in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines

(B) any pertinent [Sentencing Commission] policy statement ... in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## A) The Instant Offense and Cooperation

The facts and circumstances relating to the instant offense have been set forth in the Presentence Investigation report as outlined by both Ms. Seggerman and the government and will not be repeated in detail here. Suffice it to say that after her father's death, Ms. Seggerman was confronted with the choice of whether to disclose the existence of a large offshore account established by her father for the benefit of her, her siblings and her mother. Ms. Seggerman initially took the position with her brother John that the account should be disclosed and whatever monies were due to the IRS should be paid. She was discouraged from pursuing this course by other family members and their advisors. Her mother in particular, objected that she needed the money for herself and Ms. Seggerman's disabled sister, Patricia, to live.  Ms. Seggerman also had sought legal advice on how to accept her monies legally, without disclosing and implicating other

9

family members.  She was told it was impossible. Consequently, she made the fateful decision to agree with her siblings, mother, and their advisers to hide the existence of the offshore monies from the IRS. Ms. Seggerman thereupon pursued this course of conduct by deciding not to check the box on her individual tax returns which would have disclosed the existence of an offshore account, not advising the estate tax lawyers of the existence of this account, and agreeing with advisers on ways to access the funds without risking disclosure. She deeply regrets this failure in judgment and, as will be set forth elsewhere in this memorandum, has accepted responsibility for her criminal conduct and has cooperated fully in the government's investigation.

We appreciate that Ms. Seggerman's offense was, obviously, a serious one, and that general deterrence is an important component weighed by the Court in passing sentence.  We suggest, in evaluating the §3553(a) factors, that the Court need not be concerned about whether Ms. Seggerman will engage in further criminal conduct; we do not see that as a possibility.  We urge the Court, based on the information we will detail below, to take into consideration Ms. Seggerman's significant and important cooperation, as evidenced in the government's 5K1 filing, and her extraordinary dedication to the lives of others, and to show lenience in this matter.

The government has written a 5K 1.1 letter describing in detail Ms. Seggerman's substantial, truthful, and complete cooperation.  As demonstrated above, Ms. Seggerman decided to admit her guilt and cooperate virtually immediately after receiving a subpoena.[3]  Since that time, over 4 1/2 years ago, she has attended numerous meetings

---

[3]     As is noted in the government's 5K1.1 letter, Ms. Seggerman's immediate reaction to the subpoena was panic. She impulsively deleted a few emails from her laptop while leaving dozens of equally incriminating emails. She voluntarily disclosed this to the government at the outset of

and spent countless hours reviewing documents.  The information she provided at the outset of this investigation, before she had the financial records of the overseas account, has proved truthful and accurate and has been corroborated by the guilty pleas of her siblings, their statements in connection with their cooperation, and the documents and other information developed by the government.  Due to the government's indictment of Mr. Little and the subsequent delay in his trial, she has been pending sentence for over 4 ½ years and as a consequence, her career and personal life has been on hold.  She faces the prospect of substantially more cooperation in connection with the trial of Mr. Little.

Ms. Seggerman's cooperation, along with the other facts and circumstances discussed in this Memorandum, argue forcefully for leniency.  In relation to the offense itself, Ms. Seggerman did not come up with the idea to put money offshore.  Her father made that decision, and the problem was presented to her upon his death.  She committed the instant offense as part of a family group, with their advisors pushing to maintain the secret status of the assets left to them by her father.  She fully accepts responsibility for making the same decision, but we urge the Court to consider it in contrast to the behavior of others in various UBS cases who set out to devise and execute a scheme to deprive the government of taxes, many of whom received probationary sentences, as we will now describe.

---

her cooperation and was able to recover all the emails she had deleted.  Moreover, she voluntarily searched for and located several old, additional laptop computers which she provided to the government further ensuring that all relevant forensic evidence was preserved and disclosed.

**B) Avoiding Sentencing Disparity**

This case is part of an aggressive five-year IRS/DOJ program to pursue tax offenders who have used offshore accounts to conceal funds. More than 100 individuals have been charged as a part of that program. Based on the public record to date, courts have sentenced approximately 51 of these offenders.

Irrespective of whether the government filed a 5K1.1 letter in any of these cases, roughly 60% of these defendants have been sentenced to probation, often with a combination of home confinement and/or community service. Under Section 3553(a), it is entirely appropriate for the Court to look to sentences in similar cases and to note when those cases have consistently imposed sentences below the guidelines' suggestion including sentences of probation.

A chart attached as Exhibit B provides information on the cases sentenced so far in the offshore enforcement program since 2009.[4] The summaries provide compelling evidence that the Courts have and are repeatedly granting significant variances from the guideline range; again, this is the case even in cases lacking a 5K1.1 motion from the government.

In the context of the lenience indicated in the prior cases, certain factors about Suzanne's circumstances and conduct emerge as even more important. Most significantly is the government's motion under 5K1.1 noting her extensive and immediate cooperation, which lead to the guilty pleas of three other individuals (family members) and to the government's arrest and indictment of an alleged co-conspirator. Second is Ms.

---

[4]     This chart was created based on a review of Justice Department press releases, media reports, and public websites tracking offshore prosecutions and results. The chart does not include sentences of promoters or enablers, such as foreign bank officials.

Seggerman's lifetime commitment to causes in the public interest, as set forth in other portions of this Memorandum. Again, these facts do not minimize the crime, but they provide perspective relative to the other tax law violators who have been sentenced to probation.

For the Court's consideration we note some other examples:

♦ Igor Olenicoff, Central District of California, Case No. 07-CR-227. Controlled and hid assets in undisclosed foreign accounts resulting in tax liability to the IRS totaling $52 million. His offshore accounts contained approximately *$200 million dollars*. Sentenced to two years' probation.

♦ Steven Rubinstein, Southern District of Florida, Case No. 09-CR-60166. Hid approximately $7 million in undisclosed UBS accounts he used to purchase real estate and South African Kruggerands. Sentenced to 3 years' probation, 12 months' home detention.

♦ John McCarthy, Central District of California, Case No. 09-CR-784. Transferred over $1 million to an undisclosed UBS account and regularly communicated with UBS representatives to authorize transactions. Sentenced to 3 years' probation, 6 months' home detention, 300 hours of community service.

♦ Juergen Homann, District of New Jersey, Case No. 09-CR-724. Control of a UBS account of $5 million. Sentenced to 5 years' probation, 300 hours of community service.

♦ Paul Zabczuk, Southern District of Florida, Case No. 10-CR-60112. Directed his foreign clients to make payments to his company through offshore accounts he controlled in the Bahamas and Switzerland and further funded those offshore accounts through other payments. Sentenced to 3 years' probation, 12 months' home detention, 150 hours of community service.

♦ Jules Robbins, Southern District of New York, Case No. 10-CR-333. Created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts containing nearly $42 million. Sentenced to 12 months' probation.

♦ Ernest Vogliano, Southern District of New York, Case No. 10-CR-00327. Opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations. Actively used funds and transferred some

after learning of the criminal investigation. Sentenced to 2 years' probation.

♦ Leonid Zaltsberg, District of New Jersey, Case No. 10-CR-437. Transferred his UBS accounts to a nominee Panamanian corporation for the purpose of hiding them from the IRS and, as found by the District Court at sentencing, a calculated decision to hide money offshore. Sentenced to 4 years' probation, 12 months' home detention.

♦ Jeffrey Chatfield, charged in the United States District Court for the Southern District of California, Case No. 10-CR-4546. Held UBS account in the name of a nominee entity. Sentenced to 3 years' probation.

♦ Andrew Silva, Eastern District of Virginia, Case No. 10-CR-00044. Repatriated funds from his undisclosed offshore account by mailing himself 26 packages of currency and carrying another two packages into the United States, always structured in amounts under $10,000 to avoid detection. Sentenced to 2 years' probation, 4 months' home detention, 100 hours of community service.

♦ Sybil Nancy Upham, Southern District of New York, Case No. 1:10-cr-00326-AKH. Managed inherited offshore account of over $10 million, account was held in offshore foundation, arranged for cash withdrawals and delivery into the U.S. in amounts exceeding $10,000. Sentenced to 3 years' probation and community service.

Many of these defendants undoubtedly cooperated, and some were the subject of 5K1.1 motions from the government. We urge the Court to consider this pattern from jurisdictions around the country in considering the sentence to be imposed in this matter.

### C) Non-Profit and Charitable Works

Numerous letters annexed hereto graphically demonstrate Ms. Seggerman's commitment to public service through tireless work for socially beneficial nonprofit agencies or pure charitable endeavors large and small. Even her efforts to help others bear the burdens and trauma often presented by everyday life stand out.

### 1. Games for Change

First is Ms. Seggerman's role behind Games for Change (G4C), an influential and important organization (See Exhibit C and D). Ms. Seggerman was the guiding force and face of G4C. She conceived the idea that digital games could be used to further the greater good at a time when her thinking was unique and revolutionary. Her employer at the time, Mark Weiss, founder of Web Lab award-winning PBS series *POV* described that "[Suzanne] was one of the most dedicated, committed, creative and resourceful employees I've had in my 40+ years of nonprofit work." He noted that rather than cash in on the "dot com" boom, with "a combination of grit, resourcefulness, and the same creativity and passion that impressed me when I first met her, Suzanne created an organization that has stood the test of time, even after she passed the reins along to a new generation of leadership.[5]

Another colleague, Karen Sideman describes how Ms. Seggerman so persuaded her of the power of the G4C idea that she went to work for her.  She noted that G4C, founded, nurtured, helmed and steered by Suzanne - is the central beating heart of what is now a vibrant, influential (talked about by President Obama) movement and cultural force that has had a deep impact on how we engage with pressing social issues and with games."[6]

Her co-founder, Benjamin Stokes, eloquently describes Ms. Seggerman's dedication to G4C, describing her "tireless" efforts and her "labor of love," their use of personal savings to grow the organization, and her profound "passion to contribute to the

---

[5]      Exhibit E.
[6]      Exhibit F.

nonprofit community…Suzanne has made a real difference to countless organizations and the field itself; she will continue to do so."[7]

Another colleague at G4C, Barry Joseph, also speaks to Ms. Seggerman's commitment to using technology for the social good.  Now a youth educator at the American Museum of Natural History, he writes that her "deep belief in the possibilities of games to support social change" led to what is now the "premiere venue across a range of industries amongst those interested in the social impact of video games."  He says that Ms. Seggerman is "a wonderful person, who always seeks to make a positive difference to her friends, family, and community.  And Suzanne's definition of community is broad, extending not only across the whole planet but into the smaller pockets where the voices of marginalized are rarely heard."[8]

Game designer and author Eric Zimmerman illustrates the uphill struggle Ms. Seggerman faced with the G4C idea. He describes that she was

> …beset by opponents on all sides.  Non-game people—such as funding organizations and media—were generally skeptical about considering games as a serious cultural form, capable of becoming something like political art or documentary film.  And from game industry people—quite unexpectedly—she often got very hostile reactions, as game creators felt she was somehow disapproving of existing entertainment games by asking games to help change society for the better.

He notes that today the organization, due to Ms. Seggerman's "tireless dedication," is:

> …widely recognized throughout the game industry as a key player in the cultural impact of games. Its festival annually brings together thousands—representatives from major grant foundations, media artists, critics and scholars, game creators, political activists, educators, and others who want

---

[7]    Exhibit G.
[8]    Exhibit H.

to learn more about how games can affect social change. This is an incredible legacy for Suzanne, an accomplishment that would be hard to exaggerate in any industry.[9]

Academic experts from institutions such as MIT, Stanford and Harvard testify to the significance of Ms. Seggerman's ideas and hard work with G4C:

- ♦ Alexander Chisholm, MIT, writes that her work at G4C testifies that her work annually brings together industry, grant foundations and media artists, to talk about games in education and social impact and to promote a medium for "rich, meaningful, and life-changing experiences."[10]

- ♦ Lucy Bernholz, Stanford, described Ms. Seggerman's as a "media visionary. She was one of the first non-academics to understand and promote the educational capacities of games and game design as a form of citizen engagement. She brought together scholars, nonprofits, foundations, commercial game designers and professional educators to build awareness and understanding of these tools. Her leadership and advocacy about the power of "game design" as a pedagogical tool helped inspire many people who had previously seen video games as entertainment at best, and, at worst, something much more nefarious."[11]

- ♦ Colleen Macklin, MIT Media Fellow, says that Ms. Seggerman's "dedicated leadership of Games for Change in particular has had a lasting impact on the use of games for the greater good." She says that Ms. Seggerman is "an honest and open collaborator, with an impressive work ethic."[12]

- ♦ Marcia Stepanek, NYU and a former Knight Fellow at Stanford University, writes that "...Suzanne's work as a documentarian and filmmaker, as well as her well-publicized travels around the world to help others, have demonstrated to all of us her dedication to making the world a better place." She characterizes Ms. Seggerman as "an all-around "good egg" as well as "someone who retains the capacity and vision to keep doing more good in the world."[13]

---

[9]    Exhibit I.
[10]   Exhibit J.
[11]   Exhibit K.
[12]   Exhibit L.
[13]   Exhibit M.

♦ Mary Sweeney, Harvard, says that Ms. Seggerman is a person with "strong character…extraordinary leadership skills and passion to be a force for good in the world…." She notes that Ms. Seggerman "exemplifies one who compassionately follows through on a vision, even despite, at times, discovering her own clay feet."[14]

In sum, it would not be an overstatement to say that Ms. Seggerman is the central force behind the growing movement to harness the enormous power of gaming to further social consciousness and the greater good. The former Senior Policy Analyst in the White House Office of Science and Technology Policy, Dr. Constance Steinkuehler explains:

> Suzanne is really the founder of the field of games for impact. … While games may seem a surprising focus for individuals interested in improving education or the lives of young people, indeed they are the only medium that can change screen time into activity time and with more than 97% of American youth gaming, the notion that we might create game titles that benefit their emotional, intellectual, and social lives is no longer a novel one.[15]

Joichi Ito, Director of the MIT Media Lab, and among other things, serves on the Boards of the New York Times Company, The John D. and Catherine T. MacArthur Foundation, and The John S. and James L. Knight Foundation, notes that Ms. Seggerman's work "has had a dramatic positive influence on our field but also the society at large." He says, "She has created jobs and roles for many creative people hoping to have a positive impact on the world," and "is also a tremendously valuable asset to the future of education in the United States."[16]

The current President of G4C sums up how Ms. Seggerman's efforts with that organization have made the world a better place, and changed even individual lives:

---

[14]    Exhibit N.
[15]    Exhibit O.
[16]    Exhibit P.

I currently serve as the President of Games for Change Inc., the nonprofit organization that Suzanne co-founded in 2004. Additionally, I am faculty at the new MFA program at the School of Visual Arts (SVA) in New York, called Design for Social Innovation.

In both capacities, I hope to dedicate my career and my time to what I feel is a great cause—how we could use the power of design and media to influence society in a positive way. After serving five years in the military in a conflict zone, and seeing firsthand the challenges and the price of hatred and ignorance, I believe that we could educate and inform a new generation to become better global citizens, be highly connected and more driven by empathy.

I've known Suzanne for 10 years, since I arrived to the U.S. as a young immigrant.  At Carnegie Mellon University I designed a video game called "PeaceMaker," which was a poster child in the emerging movement of games for social change and learning. Suzanne was instrumental to our team's success.  As young students, we had very limited resources and access to high-profile partners and stakeholders.  Suzanne identified the potential of our game from the moment we met, and she was relentless in providing us with opportunities and encouragement. Through Suzanne, we got to present in major conferences (including the prestigious Games for Change festival), we gained exposure to national and international press, and we even got introduced to incredible funding opportunities.

However, Suzanne's influence on my life and career choice is bigger than her generosity and commitment to help with our early project.  I believe that her dedication to the field of games for social impact—which she literally defined with her own hands—has led me to take a similar path. Without Suzanne's mentorship, her example, and how she paved the way, I probably couldn't get to where I am now.[17]

---

[17]     Exhibit Q.

### 2.  Other Charitable Activity

Although Ms. Seggerman has been unable to obtain full-time work in charitable endeavors due to the pendency of this action, she has continued to render charitable acts throughout this time. After moving to Kenya with her daughter, Ms. Seggerman has continued to share her time, knowledge and energy with those around her.

A neighbor there who works as a director at the World Bank, Christopher Finch, with his wife, discusses Ms. Seggerman's efforts in Africa.  Earlier this year, he notes, she "organized a week-long session for local Maasai children together with foreign children from the International School of Kenya to learn about Kenya's diverse birds (especially raptors) and bird conservation with the Kenyan head of the Peregrine Fund."[18]

Lee-Anne Ragan, a Canadian small business owner, whose husband works for the U.N. in Nairobi, describes how Ms. Seggerman, in a "stressful and difficult" living environment, has helped both "individuals and communities she comes into contact with. For example, she worked with a man in a distant community in Kenya called Lamu, to bring him to Nairobi to fulfill his dream of living and cooking in Nairobi."  Ms. Ragan then describes how Ms. Seggerman "met a young, 10 year old Maasai boy named Dennis, who wants to be a doctor" and "committed to paying for his full schooling, after recognizing his potential.  This to a boy who had never before seen a computer or worn shoes.  [Ms. Seggerman} has a rare gift for [identifying] assets and building on them, from a perspective of capacity building communities that others may only see deficits and pity."[19]

---

[18]  Exhibit R.

[19]  Exhibit S.

Ms. Seggerman recently built on these contacts and experiences to raise money for scholarships for underprivileged children and to help young women in Kenya. Katherine Angell, a friend there, illustrates how seamlessly Ms. Seggerman has integrated herself into the Kenyan community and quickly focused on how she could help local disadvantaged residents. She writes that Ms. Seggerman has a "deeply rooted commitment to helping those in need—her work as a volunteer strategic planner at the Hawkers Market Girls Center in Nairobi brings her into regular contact with girls from the poorest of backgrounds, whose everyday life is a constant struggle. Located in one of Nairobi's most challenging neighborhoods, the Hawkers Market Girls Center is a place where few expats venture; Suzanne has done so without hesitation. She is a regular presence at the Girls Center, and her kindness and dedication to the girls' well-being is an inspiration." She notes Ms. Seggerman's belief "in each girl's potential" and her efforts to "support them with practical advice and assistance. She has shown herself to be a loyal mentor and an impressive role model."[20]

Shariffa Keshavjee writes:

> [When] Suzanne Seggerman arrived in Kenya, I met her and told her about the work of the Hawkers Market Girls Centre. She showed immediate interest and offered to volunteer her time and expertise to support the initiative.
>
> Suzanne was in her element. She motivated the girls to improve the quality of their products and put in place quality control systems. This was such an important initiative for sustainability. Once she was satisfied with the quality she began to identify markets for the beads, aprons, casual bags, uniforms, etc.
>
> She went as far as developing new product lines. An example was her effort in assisting the students to design

---

[20]     Exhibit T.

tablecloths with matching napkins for the more sophisticated market. She went a step further and began marketing them successfully at the International School where her daughter Tatiana was a student who helped in the marketing, which is a reflection of their family values.

Suzanne also, without prompting, individually mentored the girls in life skills helping them to set their goals and find their true vocation.

[. . .]

We see in Suzanne the spirit of generosity and humanistic values that reaches out to the needy. In our case her focused efforts gave the girls dignity, self-esteem and a means to earn higher incomes, skills so vital for girls with no other options in life. She has touched their lives and opened doors of hope for these girls.[21]

Perhaps no letter better demonstrates Ms. Seggerman's commitment to helping others than the letter of Alexis Calice. This letter conveys to the Court Ms. Seggerman's character. Her first instinct is always to help others in need, but unlike many of us, she acts on it even in the face of personal danger:

I had the good fortune of meeting Suzanne Seggerman Meyer in August of 2013, at the International School of Nairobi where our children are students. We were both very new to Nairobi and the third world, and over the course of the year became very close. Shortly after we arrived, Nairobi was rocked by a horrific terrorist attack. A nearby mall, a place we all had been to many times, was seized by Somali terrorists. 67 people were brutally murdered, among them children, parents and teachers from our school community. I distinctly remember Suzanne's instinct, which was to immediately buy food supplies and drive down to the mall, still under siege, to help with relief work. As the four-day siege dragged on, Suzanne was there, feeding Red Cross workers as they aided hostages out of the mall. From that incident onwards, the security situation

---

21          Exhibit U.

in Kenya has deteriorated, with crime and terrorism levels deemed 'critical' by the U.S. government. Many expatriates have either chosen to leave or to live behind very high walls. Suzanne, in my view, displayed a particular strength of character by choosing to travel to the centre of Nairobi by local transport, (an act most in the diplomatic and development community would never do) to coach and teach teenage girls from extremely impoverished backgrounds, with the aim of getting them into university.

[. . .]

When Suzanne told me about the events leading up to her current legal situation, I was rather surprised, because it struck me as totally out-of-character. I know that Suzanne is deeply remorseful about what she did wrong; she is, in fact, a deeply moral person. Further, she is a dedicated mother, and I am sincerely concerned that if she is separated from her young daughter, that both would suffer terribly. If I may, I ask for your lenience in her case."[22]

This is Ms. Seggerman. A Facebook posting from Hurricane Sandy shared in a letter perhaps best sums up Suzanne's concern for others, the elderly and infirm as well as the small and unprotected. When everyone else seemed to be worried most about their own families and property, and about getting out themselves, Suzanne remembered those left behind:

Suzanne Seggerman, November 1, 2012:

So I am hoping someone might help me. We live in downtown NYC and have mercifully stayed away all week. But there is a mostly stationary senior citizen I help out when she needs to get somewhere (Dr appt, groceries, etc.). She lives on the 20th floor of a bldg on 14th and 5th. I've been trying to call but they surely have lost power. It is a doorman bldg so I assume they know about her. And she has younger friends in the bldg. But if someone is going to be near there and could swing by the front desk tomorrow

---

[22]      Exhibit V

and make sure they know about her, that would be amazing. It's 7 east 14th and her name is Belle Burke. Pls let me know if you think you can manage it. Thank you so much. Also, if anyone knows how I can let someone official know, that would be great too.

Thanks to Suzanne's encouraging others to follow her own example, Mrs. Burke made it through.

The letter of Stephen Heintz, President of the Rockefeller Brothers Foundation, speaks to Ms. Seggerman's wide range of charitable endeavors at the expense of financial reward as well as the sincerity of her remorse:

> Suzanne has devoted her entire life to good works rather than seeking highly remunerated employment. She has raised funds for human rights, and humanitarian aid, and has been an active volunteer for organizations serving homeless people living with HIV/AIDS and elderly New Yorkers with limited social connection. In her professional work, Suzanne has been a leader in developing internet and digital media platforms for social good. I was particularly impressed with her work as co-founder of Games for Change. The digital world is full of mindless content and Suzanne's creative work to develop highly popular games for educational and socially useful purposes like humanitarian aid has been truly groundbreaking.
>
> [...]
>
> When Suzanne's husband was offered the opportunity to be the founding dean of a school of journalism in Kenya, Suzanne embraced the change as an extraordinary life experience for them and for Tatiana. They made the move, Tatiana adjusted rapidly to vastly different circumstances, and Suzanne quickly found organizations through which, as a volunteer, she could contribute her talents and compassion. Her principle focus has been with a program that supports girls from some of the worst slums of Nairobi. The plight of Kenyan girls has been much in the news of late, highlighting just how important this work is. Suzanne has told me moving stories of the challenges the girls face and the strength and courage with which they live their

lives every day. They have inspired her and I am certain she has inspired them with her energy, optimism, and generosity.

Suzanne has described to me how profoundly she regrets the mistakes she has made and the sincerity of her remorse was very clear to me. I know Suzanne to be a person of integrity, generosity, compassion, and community spirit. She is a wonderful mother and life partner to her husband, Michael Meyer. One only has to spend a few minutes with their daughter, Tatiana, to see Suzanne's positive influence. Tatiana is a girl with remarkable intellectual and emotional intelligence, talent, and a very positive outlook on life. She is very much like her mother.

In reaching a decision about her case, I hope the Court will give full consideration to Suzanne's lifelong work in service to others. It is clear to me that her remorse about this case has only reinforced her drive to give back to society. I very much appreciate the Court's review of my observations.[23]

**D) Overall Character**

Remarkably over the course of her lifetime, Ms. Seggerman has managed to regulate several mental health issues such as ADD and a mild anxiety disorder while always determined to make a positive contribution to the world. We have submitted dozens of letters from friends of Ms. Seggerman, who describe her steadfast good character. We herein summarize a few of these.

Stephen Ives, who has known her for more than 20 years: "I consider her to be a deeply moral and conscientious person…." In his experience she has been "utterly straightforward, she conveyed a heartfelt authenticity, and there was an unmistakable integrity in how she conducted herself. These are qualities you can't fake, or invent, and to me, they speak to the bedrock morality and honesty in

---

[23]      Exhibit W.

Suzanne's character. She is, quite simply, the most honorable person I know. I would trust her with anything.[24]

Hans Witteveen, a longtime friend:  "Suzanne has always been a warm and considerate friend, who always stood ready to help us in whatever way she could. She has been particularly welcoming to our children and her house was always open to them. For instance, when our youngest daughter, then only four months old, was in hospital for a period of time, she took great responsibility to take care of our other daughter and assisted in whatever way she could to help our family with the practical and emotional implications of having a child in hospital. Being a loving and devoted mother and wife herself, Suzanne knew as no other what a family needs in such times of distress."[25]

Sarah Louppe Petcher, a second cousin, describes how even when Ms. Seggerman was taking care of her severely disabled stepson, she still found time to attend to the needs of Ms. Petcher's mother, who was severely debilitated with Alzheimer's, noting that Ms. Seggerman and her family have been "anchors in my life." This became even more evident when my Mother developed early onset Alzheimer's at 55 years of age. I was 30 years old, not yet married, just starting my career and my Mother's only child in the United States where she resided. It was overwhelming…Suzanne …remained the one constant family member willing and available to help….When my mother's disease became advanced, most of my Mother's family and friends stopped visiting or providing support. This contrasted with Suzanne's behavior. Every time she and her family were in town, they would spend significant time visiting my Mother, taking care of some of her basic needs. Towards the end, despite the unpleasantness, I could always rely on Suzanne to take the time and travel the emotional rollercoaster such visits implied.[26]

Many writers describe the essential Suzanne Seggerman by noting her professional skill, her charitable good works, and the strength of her family. Andrew Solomon, a Columbia University professor of Clinical Psychology and longtime friend, speaks to the

---

[24]     Exhibit X
[25]     Exhibit Y
[26]     Exhibit Z

many benefits that the public, family and friends derived from Ms. Seggerman's empathy, energy and loyalty. He writes:

> I work extensively in the philanthropic world, and I meet many people whose idea of helping the world is simply to write a check. Suzanne is not one of those people. She helps the world by rolling up her sleeves and going out to work on the most painful and difficult issues of our times….
>
> We are both members of First Presbyterian Church in Manhattan, and she has been a fine and responsible person within that community, loved and respected by all. She has long worked in New York as a volunteer for Visiting Neighbors, escorting elderly to doctor's appointments and so on.
>
> She is as staunch a friend as anyone could hope to find: generous, attentive, reliable, and empathetic. I count myself very lucky to have met her all those years ago. Thirty-five years on, I recognize that there are few friendships I formed so wisely and so well. I have written at some length about my experience of depression, and about the unfortunate discovery that many friends couldn't cope with the idea of my illness. Suzanne was there for me a hundred percent, and I know she'd be there for me again. I'm writing this letter out of deep conviction, and as a kind of thanks for a friendship that has vastly enriched my life.
>
> I have spoken about Suzanne's work, and a bit about her gift for friendship, and now I want to turn to the other arena in which she has been exceptional, and that is motherhood. As stepmother to her husband's severely disabled son Mix, she has been fearless. Mix's care was at one point an overwhelming responsibility borne largely by his biological parents, but over time, Suzanne came to do more and more to help Mix. She never complained about the burden; she never lost faith in Mix himself; she never failed when her insights could help guide his treatment. It was a joy to watch someone whose work had been given to fixing the world operating on the micro level of saving a single defenseless life.
>
> And then Tatiana came along—a beautiful, funny, wonderful little girl. Suzanne gets enormous credit for how

well Tatiana has turned out. She's been the most devoted mother I've ever seen, starting always from love, indulgent when she can be, but also very capable of setting limits. She's bred a child who is resilient and affectionate, and to see them together is to see what parenthood should be.[27]

Ambassador Frank Wisner also speaks to Ms. Seggerman's commitment to friends and family. He writes:

> To say that Suzanne Seggerman is a friend is to understate the meaning of the word friendship. She is a wonderful person, a caring mother to a bright, well-mannered daughter and step-mother to a critically ill child as well as a strongly supportive wife, who has followed her husband, an accomplished journalist, in his career with Newsweek, the Office of the Secretary General of the United Nations and more recently in Nairobi, Kenya where he is teaching. As a friend she is generous with her time and attention, considerate, supportive and engaged. It is a joy to be in her company.
>
> [...]
>
> I have only known Suzanne Seggerman to be a person of the highest principal, exhibiting a deep sense of concern for the welfare of her fellow man. As a mother, I have watched her daughter, Tatiana, blossom. As a wife, I have seen Suzanne support her husband through a long list of tough career changes and in his work to support a badly impaired child. I can assure you that Suzanne Seggerman is a very special and admirable person. In a word, during my career in government service, including four assignments as ambassador, I have known few Americans I would rather see abroad, representing the values and compassion of this country.[28]

These comments echo those about Ms. Seggerman's relationship to society and her role as a friend, a mother, and a tireless worker for social change.  Her college roommate

---

[27]   Exhibit AA.

[28]   Exhibit BB.

and longtime friend describes her "strong sense of morality, her dedication to serve the community and her ongoing drive to work for the public good.[29] Another friend of 30 years writes:

> From our college years onward I have always been struck by Suzanne's unfailing and remarkable generosity. She is a deeply giving person, a loyal and patient friend, always ready to lend a hand or an ear, do a favor, listen or laugh. For all the many years of our friendship she has been nothing but reliable and kind. I know that her family—whom I knew a bit, and regarded as deeply and disturbingly dysfunctional—was a frequent source of woe for her. But I also saw over the years how hard she worked to overcome and in many ways counteract the difficulties of growing up in such a context. I think her generosity—to me her defining trait—was and remains in some important ways a very conscious, positive choice on Suzanne's part on how she wishes to live. She has spent a career in non-profit organizations that contribute to her country and her society. She met and married a terrific guy, the journalist and diplomat Michael Meyer, whom I also know well and like and admire deeply. Together she and Mike are loving and devoted parents to their wonderful daughter, Tati, and Suzanne has devoted endless hours to the loving care of Mike's severely physically disabled son.[30]

There can be no doubt that Ms. Seggerman's kindheartedness extends to everyone she comes into contact with.    No one is off limits our outside the scope of Ms. Seggerman's concern or generosity:

> My name is Christopher C. Snyder. I live on the streets of Manhattan. I've known Suzanne for 25 years. She is a kind and considerate person. Always has been. She even hugs me. She has a very nice family.
>
> She has bought me many many breakfasts, lunches and dinners over the years. She buys me food every time she sees me. She always stops and buys me food. Even when

---

[29]     Exhibit CC.
[30]     Exhibit DD.

she went away for a year, she went to another country 10 years ago and she gave money to the deli so I could still eat every day. She also went to the internet to try and find my brother.

Also she is very nice. She always asks me 'How ya doin'? or if I need anything or if I'm alright.

Please Your Honor have some leniency on her. I have been in front of a judge and it is very scary. I saw her before and she was very freaked out and obviously she was very scared.[31]

### E)  Family Love and Support

One of the most important developments in Ms. Seggerman's life was when, in marrying Mr. Meyer, she committed unconditionally to loving and raising his children from a previous marriage as her own.

First, we look to a non-family member and longtime friend who describes Suzanne's dedication to these children and who witnessed firsthand Ms. Seggerman's Herculean efforts to be a loving and devoted mother not only to Tatiana but to her husband's children, despite her thoroughly dysfunctional family experience. She explains:

From the start, Suzanne was devoted to her husband's children from his previous marriage as if they were her own, and has continued to do so after having her own wonderful daughter. I had experienced my own parents' divorce and re-marriages, and I know first-hand how difficult it is to establish a rapport with step-children, especially teenagers. In this, Suzanne succeeded by far beyond the basic social expectations to become their true friend, confidant and mentor. The youngest of them was born with an incurable and life-threatening medical condition that required Suzanne's husband's full attention, with visits involving almost weekly long-distance travel. Most people would have thought twice about taking on such a burden in marriage, but Suzanne unhesitantly embraced it as part of her commitment to the man with

---

[31]     Exhibit EE.

whom she chose to spend her life, and she became actively involved in the logistics of this difficult situation. The well-being of her extended family has always been the unquestioned and defining framework of Suzanne's life, even when she had a successful and busy career or was involved in larger social causes. For her, it is always "what is best for them," even if that means upending a structure or a situation that may suit her own needs better. All of which is particularly remarkable since Suzanne grew up in a supremely dysfunctional family. By conventional wisdom, broken families breed broken families—yet, she was able to transcend this predicament. She aspired to, and succeeded in, creating the antidote to the poison of her own upbringing: a happy and warm extended family."

Beyond feeling deeply ashamed of herself under the present circumstances, she is tormented by the thought that she may have failed this family, and terrified that she may have to pay the price by being taken away from them and, especially, from her daughter Tatiana for whom such a turn of events would, of course, be devastating and immeasurably damaging.

[. . .]

In this letter I tried to convey what I know, and what I believe others should know, about Suzanne and her character. Yes, I know that she has pleaded guilty to committing tax fraud in relation to an overseas inheritance. I have no idea what could have led her to commit such an act—an act so completely out of character for someone with her ethical standards and a demonstrable lack of interest in material gain—but I truly believe that she will never do anything like this again. We all err, sometimes seriously; yet I sincerely hope that the true substance of her person—what used to be called moral fiber—and the sum total of her deeds in the course of a lifetime and across all spheres of life can be brought to bear in making the judgment."[32]

Her stepchildren themselves attest to Ms. Seggerman's devotion. Her stepdaughter describes how Ms. Seggerman opened her home to her in a time when her

---

[32]     Exhibit FF.

relationship with Mr. Meyer's first wife had deteriorated badly. Moving in with the Seggerman's created a positive influence on her life and gave her a  gave her a healing, loving environment.

> She has been my friend—buying me interview clothes for my first interviews, and groceries when I was short on cash, and taking me out to museums and cultural events. She has been my second mother—loving me unconditionally and treating me as her own daughter for as long as I've known her. Inviting me out when I've needed a night out or relaxing with me on the couch with a book when I've needed some quiet companionship. As I'm sure others have said, Suzanne Seggerman is an incredible human being. I have never known her to put herself first, or to neglect another's feelings or difficulties. Suzanne always has time for me. Always.
>
> I am fully aware that my stepmother has pleaded guilty to tax crimes, and I am writing this letter in an effort to help you understand her place in our family as one of irreplaceable importance. My faith in Suzanne has not been shaken in the face of her present circumstances; in fact, I am impressed and humbled by the grace and courage with which she is facing this situation head on."[33]

Ms. Seggerman's stepson, Nick Meyer:

> I've known Suzanne since I was 10 years old, and have always known her to be incredibly kind and generous a fierce protector of those she loves, and a gladiator for those that just need help.
>
> It's not easy to build a family, and it must be so much harder to come into an existing family.  When I met Suzanne I was a skeptical, worried kid: *Who was this lady?* But over the next 18 years she became a second mom, and after having my half-sister Tatiana, did everything she could to bring the two halves of our family together.

---

[33]    Exhibit GG.

This was a lot harder than it sounds: my brother John Mix has been very ill from birth. Having gone through dozens of procedures large and small, he now requires a heavy motorized wheelchair to get around, and is on a ventilator full time.

If we go anywhere for more than a day, it takes weeks of planning to line up medical suppliers, equipment delivery, and multiple checklists full of medications and supplies. Not to mention a way to transport everything. Planning Thanksgiving and Christmas becomes a full time job, and we don't have many options on where to go: commercial airlines won't let John Mix fly.

Suzanne made it work. She bought a farm halfway in between New York and Virginia so we could meet in the middle. Not just for special holidays, but for quick day trips too.

Suzanne bought a van big enough to haul all of Mix's life support equipment, with room for us all to squeeze in, and would regularly drive down from New York for the day to take Mix and Tatiana out for lunch.

When Mix started on an incredibly strict (and expensive) diet, Suzanne made sure she ordered exactly the right organic food from wherever she needed to, and had it ready for his arrival.

With all this, it would have been easy to throw up your hands and just give up. But Suzanne didn't, and that's why we love her. Without Suzanne's financial generosity and pure hard work, there' no way our family would have been able to spend more than a day together at a time.

Suzanne has done a lot for our family, but personally, she's also done a lot for *me*.

I moved back to New York City 5 years ago after living in San Francisco. I was 24, starting another company after the last didn't go so well, and was pretty broke. I showed up at Suzanne's door with an anxious, needy, gassy dog "Connor" in tow and asked to crash for a few weeks.

A "few weeks" turned into three years, which is not something many parents would be happy about. But

> Suzanne made me feel welcome, and without her there's no
> way I would have been able to make my startup the success
> it was.
> I was still living there when this case started, and I
> witnessed her struggles to find the next step in her career.
> Suzanne had accomplished so much good with Games for
> Change, but was having trouble finding a new job. Over
> and over she would get really excited about a new public
> policy job, or a new non-profit, but with this case looming
> she was too risky to hire.
>
> Suzanne has the heart and the mind to really help the world,
> we just have to let her. I'm asking for leniency, I don't
> know anyone who deserves it more.[34]

As is already apparent, however, the most important thing in Ms. Seggerman's life is not her non-profit work or her unfailing generosity to others. It is her daughter Tatiana. Family friends and parents of Tatiana's friends and schoolmates provide a consistent perspective of this mother-daughter relationship. One couple has observed that Ms. Seggerman "is a very kind, conscientious and supportive parent to her daughter, Tati. She is a "'hands on' mother who is intimately involved in her daughter's life and obviously provides a loving and nurturing environment for her. … [I]f children are a reflection of their parents (even to a small degree), Suzanne and Michael's daughter, Tati, is a perfect example of mature, kind and thoughtful teenager. …She is a very considerate friend to our daughter and a respectful guest towards us. She never has a harsh word to say about any of her peers and tries to be as inclusive towards others as possible. We wish we knew more girls like her."[35]

Another longtime friend writes:

---

[34]    Exhibit HH.
[35]    Exhibit II.

A little shy, Tatiana relies on her mother to advocate for her and to help her through difficult situations. Suzanne still tucks Tatiana in at bedtime and uses that time to talk about whatever is on her mind. This ritual has become even more important as Tatiana begins to cope with the increasing complexity of her teenage years. Suzanne has taught Tatiana to be a compassionate, kind, inquisitive and tenacious young woman.

[…]

It is my sincere hope that the court will exercise leniency with Suzanne. Suzanne still tucks Tatiana in at bedtime ….. She has already paid a heavy price for her mistake and her family needs her, particularly her daughter Tatiana who is at a critical juncture in her life. I am certain that Suzanne has learned very valuable lessons from her situation. She wants to make amends and to continue to make valuable contributions to society.[36]

A third witness to this relationship is Willa Bernstein, a former Assistant Attorney General and staff attorney in the Mayor's Office:

All of my experiences with Suzanne have reinforced my sense of her as an exceptionally devoted mother. She and Tati are obviously very close in the way that an only child is particularly close to her mother. But beyond that, Suzanne is always seeking out interesting experiences for Tati and helping to facilitate opportunities for her to form strong friendships. She reaches out to Tati's friends and their families to strengthen bonds by spending time together. My daughter, Anna, has benefited from these efforts and found a close friend in Tati, partly as a result of Suzanne's commitment to her daughter.

I feel lucky to have Suzanne's friendship. In deciding her punishment, I hope that the Court will take note of the aspects of her character that make her a wonderful friend and mother. Thank you for considering my thoughts on this matter."

---

[36]     Exhibit JJ.

**E)      Acceptance of Responsibility**

Most defendants come before this Court and state that they accept responsibility for their wrongful acts. Ms. Seggerman's friends have seen this first hand and testify to the fact that her remorse is compounded by the possibility of a separation from Tatiana and injury to her entire extended family.

Carol Volk, a friend since 1991and former roommate, writes:

> Ever since this legal issue has come to light, Suzanne has admitted to me that she is guilty of tax crimes related to an overseas account left to her by her father.... ring my thoughts on  with how to think about and reconcile. It is important to note, however, that Suzanne has paid a tremendous price: this situation has had a devastating effect on her. She has been torn to pieces emotionally, and her life has been wrecked. She was obliged to step down as President of Games for Change, which was a great passion and provided a sense of accomplishment and satisfaction to her. Her long-built reputation as one of moral standing has been damaged beyond repair. Her life, it seems, will never be the same.
>
> It is also important to note that Suzanne is an exceptionally loving mother to her daughter Tatiana, who is a sweet, unspoiled, smart and all around lovely girl. As her father is working in Kenya, where security is currently dicey, without her mother Tatiana would be forced to live with another family. Given what a truly lovely and sensitive girl she is, who shows promise of growing up into a very fine and caring woman, I hope she will not be forced to live without her mother.[37]

Another friend, a clinical psychologist who has counseled Ms. Seggerman, speaks to Ms. Seggerman's efforts to learn from her errors as well as her acceptance of responsibility and remorse for her conduct.

---

[37]      Exhibit LL

I've known Suzanne Seggerman for over five years as a participant in a number of my residential programs. In addition to individual meetings during these weekends, we've corresponded and I've served as one of the teachers and guides supporting her through difficult times. She has told me that she committed tax crimes, and shared the depths of her remorse for her actions, and the suffering she has lived with.

Several things have impressed me about Suzanne. She has been consistently honest with me, allowing me to see the deep sadness and pain that she's struggled with, as well as the lack of self-pity. Her attitude is both brave and mature, one of taking full responsibility for her life. Suzanne reached out for guidance a number of times, and each time asked questions that let me know that she was diligently engaging in the "work" that accompanies the workshop. In groups she's been open, vulnerable and disclosing, and always willing to work with feedback. While there are many examples, the most poignant has been her capacity to work with blame, and find her way to forgiveness, to opening her heart. Her dedication to honest healing always inspired those who joined with her in our small groups. In fact, over the years she has increasingly assumed the role of supporting others going through challenging times.[38]

## IV.
### CONCLUSION

Nothing speaks more eloquently, directly and compellingly to the character of Ms. Seggerman, and provides the full picture of the woman standing before the Court for sentencing, than the letter of her husband, Michael Meyer, set forth below in its entirety.

I would like to write you on behalf of my beloved wife, Suzanne Seggerman. We have been together for 16 years, not a long time, in the scheme of things, but long enough for a marriage to test itself. To say that we have been happy is an understatement. My marriage is the rock upon which our family is built.

---

[38]    Exhibit MM.

Certainly there have been challenges. I brought many with me, including a first family that I support and a severely handicapped child whose life has often been at risk. Love and devotion to one another and our extended family see us through hard times and good.

I married Suzanne because she is big-hearted. Generosity shapes her life and relationships – friends, family and even casual acquaintances.  With that comes related qualities: authenticity and emotional honesty. Suzanne says what she means, means what she says. Others often put themselves and their own interest first; Suzanne puts others first. She leaps to help where others stand back to consider, shade, defer.

She built Games for Change to use the new power of social media as a force for social change  --  equity in a world of inequity.  That was not easy; it took years.  Suzanne routinely worked from 6 or 7 in the morning late into the night. She stepped down when her legal troubles began in order not to compromise the company. It hurt her more deeply than I could express.

Closer to home, Suzanne takes care of Chris, our corner homeless person.  I give him money; she goes the extra mile to arrange with the local deli to make him healthy sandwiches – tuna with extra mayo on rye.  He asks for ice tea; she gets him ice tea with lemonade reinforced with vitamin C.

Our youngest son from my first marriage, Mix, was born with a half a heart and seriously malformed lungs. Surgeons did their best, but he lives on a ventilator and life-support. Suzanne embraced him as her own. Though unable to go to school, he writes well. In his early teens, he experimented with writing reviews of video games the way some do movies. Wanting to help, Suzanne tracked down his favorite editor at Wired and persuaded him to read Mix's work. Soon after, at 19, he became an intern/writer for the magazine. Thanks to Suzanne, he has a rewarding professional life, so in contrast to the depressing isolation that could easily have been his lot.

The farmhouse Suzanne bought in Maryland, using her Dad's inheritance, was an act of love. More than anything (and at the expense of good judgment) she wanted a place where our family could be together, particularly Mix. He

cannot travel more than an hour or two from home. He requires the full range of medical support: 24-hour nursing, a portable medical ward with all his equipment and medicines, specially prepared foods, back-up emergency service and a generator in case the power goes off. Suzanne would organize a great deal of this, so that all four of our children could be together for Christmas, Easter other family holidays.

My oldest son, Nicholas, was thrown out of MIT. He wanted to start companies, he said, not study. Later, when he could not make ends meet, Suzanne invited him to stay in New York. He needed a place only for a month, he told us; he ended up living with us for three years. During that time, he matured into a confidant, directed and settled young man, very different from the way he was when he came to us. I credit that in large measure to the home Suzanne created around him. And when my oldest daughter, Brooke, needed a place to roost while getting started in New York, Suzanne gladly took her in too.

Our youngest daughter, Tatiana, thrives because of her. I am a good father. I love and cherish my children. But I am also dedicated to my work. My responsibilities at the United Nations, and now as dean of a graduate journalism school in Kenya, take me far afield. Suzanne is *there* for Tatiana in ways I could not be. Unlike me, she can intuit Tati's passages through these unsettled early teenage years, when so many young girls lose track of the values that set our paths through adulthood.

Suzanne is the one who finds the art and music teachers, beyond what Tati's school can provide. She gets tutors to help in subjects where she would not otherwise shine. Here in Nairobi, Tati is at the top of her class in math and science. When some of her classmates and their parents were killed in the terrorist attacks in Nairobi last year, Suzanne encouraged her to express her feelings through art. (One poem won a Scholastic Award.) She finds special projects that enrich Tati's life the top of her class in math and science. When some of's Maasai Mara, for example, where she went off into the bush with a crew of Maasai middle schoolers to persuade village communities to stop poisoning vultures.

Suzanne tucks Tati into bed every night. She rubs her feet, sore from track, and listens quietly as Tati talks about

events of the day. She helps her through the awkward questions of puberty. They play Scrabble. Snuggle up and read together. Go to museums (endless museums) and art shows together. Tati needs her mother.

I love Suzanne for all these qualities. She was born to a world of great material advantage. That she would grow up to be so unspoiled, so generous and embracing of others who did not enjoy such advantages, I consider to be a gift from God. She can be infuriatingly scattered, inattentive to detail and impulsive. She makes mistakes by acting from a place of emotion, without thinking. She knows little of household economics, let alone finance. But subterfuge, manipulation and dishonesty are not part of her DNA.

This may sound odd, under the circumstances, but Suzanne is fundamentally honest. She has never lost her sense of responsibility to her family and to society. Her first thought at the outset of these difficulties was whether she would be able to vote. She is profoundly sorry for her mistakes. She punishes herself as much as she is punished – the loss of her job and career and the trouble in finding a new one.

In Africa, she is trying to rebuild. She is putting a new home together. She works with 25 or so young girls in a Nairobi slum, making lunches for them, buying fabric and teaching them to sew or use a computer so that they can do more than sell vegetables, squatting in the dust along the road, and earn just that bit more money to send their own children to school and give them a better chance at life, breaking the cycle of poverty. They look to her with hope.

This is the pattern of Suzanne's life. I hope you will consider it in making your decision.

A final point: I have said that Tatiana needs her mother. Beyond the natural love – and need – of a young daughter for her mother, there are special reasons in this case for why they should be not be separated.

In 2013, when I turned 61, I faced a dilemma. The mandatory retirement age at the United Nations is 62, and I cannot afford to be without a job or comprehensive health insurance. Apart from my obligations to Suzanne and Tatiana, I am the sole means of support for my previous wife and our youngest son, so gravely ill. With Suzanne unable to find employment, and no appropriate jobs for me

at that time in the US, I accepted an offer to start a new masters-level journalism school in Kenya. It is a five-year commitment, bound contractually.

Suzanne and Tatiana accompanied me to Nairobi and, last August, we settled into a diplomatic area near Tatiana's school. Like other expatriates in Kenya, we are very conscious of security issues. A month after we arrived, terrorists attacked the Westgate mall not far from our home; children from Tati's school taking a cooking class were special targets. Since then, attacks by Somali Al Shabaab terrorists have escalated: bus bombings, drive-by shootings in supermarkets and public spaces, execution-style killings of innocent civilians, including children. Acting preemptively on intelligence reports that an international school would likely be targeted, the Canadian mission recently directed its diplomats to remove their children from the country. The U.S. embassy and United Nations agencies are considering similar measures.

Tatiana was happy in Kenya. She loved her friends of all nationalities at the International School of Kenya. The deteriorating security situation, however, has led us to conclude that it is no longer a safe place for her — especially without her mother to safeguard her movements.

If Suzanne were given a custodial sentence, our family would be broken apart. We do not have family in New York who could care for Tatiana. I cannot imagine anything more destructive to her future. We literally do not know what we would do in this situation.[39]

Ms. Seggerman herself has written to the Court, also set forth below in its entirety.

I'd like to thank you for the kindness you've shown me over the past years — letting me visit my family in France several times, and above all letting me live in Kenya with my husband and daughter. I know you didn't have to do that. It meant the world to me and my family. In fact it changed my life.

---

[39]     Exhibit NN.

To say that I am remorseful for the disastrous decisions I made is to barely touch the surface. Barely a day goes by when I don't wish I could take it all back, that I could somehow go back to that room in that fancy hotel and be the person I could have been, the person I should have been. Instead of making a decision, motivated by greed, with my family members, I had the opportunity to stand up for what was right and legal — disclosing the existence of my father's Swiss account with the IRS. And I failed.

Having had the last four years to reflect on my actions, I continually come back to the fundamental question for me - how can I have lived one life as "a good person" while hiding this terrible behavior? How could I have truly thought of myself as someone of virtue while all along committing such serious crimes? I believe in taxes as an important part of our society, but one can't believe in just certain taxes; I ignored my duties as a citizen, justifying my actions by telling myself I wasn't hurting anyone, and that I was helping the people I loved. In fact, I was doing the exact opposite by participating in a criminal enterprise, and have hurt them immeasurably. I have no one to blame but myself.

I actually care deeply about being a good citizen, and I feel much grief for having let down my family, my friends, my community, and my country. I was upset to learn that I might not be able to vote. I love my country and feel lucky to be an American citizen. But I've utterly disregarded my social contract. It would deeply upset me to lose the privilege but I recognize that it IS a privilege, not a right. So are the many benefits of being a citizen of this country that I flouted by committing these crimes. In Africa I saw all around me the lack of basic services that I utterly took for granted. So much was given to me - and yet I chose to take more. There is no excuse for that.

I deeply regret the pain I have caused my family. My husband, Mike, has already been through so much in his life, and now, because of my bad decisions, he bears the burden of caring for two families. When I first met my him, we agreed that I would provide for any children we might have as he already had a family of 4 to support, including a gravely ill son. With my crimes, I went from being an independent woman with an excellent job and a good

reputation to being unemployed and shamed. I'm devastated that my actions are having these consequences for Mike's life and especially for the health of his son, which relies heavily on his financial support. To see the effect on Mike's own health and well-being, which has declined in the past few years, also gives me much grief and regret. Mike doesn't deserve the pain I have brought him. And neither does his son.

And the harm I've caused my sweet daughter Tatiana is irreparable. How do I explain that this person she loves committed so serious a crime? How will that shape her world view in the long run? I am so ashamed of my behavior and so sad that I had to explain myself to this wonderful, gentle and innocent kid. I realize now that I committed a crime against her as well. I can only hope that by my taking full responsibility for my actions will I show her that I can face the consequences of my terrible decisions and become a better person for it.

I failed in my ability to both provide for Tatiana financially as well provide an example to her of a productive, working mother. With the loss of my job, I brought huge financial instability to my family. With my actions I have also brought tremendous shame to them. I worry constantly about what it will mean for her when Tatiana has to go to school with her friends knowing about my past behavior. I was striving to be a devoted mother and an effective leader, and what I always wanted for myself has slipped away, my reputation destroyed because of my poor decisions.

I have taken Tati from a world that she loves with family and travel and a sense of joy and put her in a place of great uncertainty. For years, she has not known what the fate of her family would be, and that is a terrible place to put a child. This summer has been especially hard on her. She has nightmares every night, the likes of which I have never heard before - little girls in burlap bags being burned alive, buildings being dropped on her family. She wakes up trembling and shaken. It was my primary job as a parent to make her feel safe, and my actions have robbed her of that most precious thing. As an adult, I can get through whatever comes from my actions, but I can never return the stability I threw away.

43

> Your Honor, I am ready to accept whatever sentence you
> feel is appropriate. It is time for me to face the
> consequences of the disastrous decisions I made.[40]

We acknowledge that Ms. Seggerman has committed a serious offense and that in passing sentences, courts are compelled by law to consider the nature of that offense, the applicable sentencing guidelines, and the need for deterrence. But the flexibility now given to courts in a post-*Booker* environment allows for the consideration of other factors, including a demonstrable trend of lenience in recent cases involving offshore accounts, as well under the rubric of the history and character of the defendant.

Ms. Seggerman has a lifetime of service and generosity.  She has improved this country's systems of education and youth outreach through her dedicated and innovative works.  She has made positive impacts on individual lives – friends, family members and others — for decades.  She has made full restitution to the victim of her offense.  She has genuinely and fully accepted responsibility for her criminal conduct.  And, though destroying her sibling relationships irreparably, she has devoted much of her time in the last four years to providing substantial assistance to the United States government in the investigation and prosecution of others, leading to three guilty pleas of her family members and the indictment of an attorney alleged to have unlawfully enriched himself and assisted the family in decades-long criminal conduct.  She intends to continue this cooperation to whatever extent needed and will likely testify at his trial.

---

[40]    Exhibit OO. Also see Exhibit PP for additional reference letters.

We respectfully submit that taking all of these factors into account under Section 3553(a), the Court sentence Suzanne Seggerman to probation with special conditions of community service.

Dated:        New York, New York

                September 4, 2014

                                        Respectfully submitted,


                                        By:   /s/ Russell M. Gioiella
                                              Russell M. Gioiella (RMG 5898)

                                        Litman, Asche & Gioiella, LLP
                                        140 Broadway, 38th Floor
                                        New York, New York 10005
                                        212.809.4500
                                        rmg@lagnyc.com

                                        Attorney for the Defendant

Of Counsel:

Scott D. Michel, Esq.
Caplin & Drysdale
One Thomas Circle NW
Suite 1100
Washington, DC 20005
202-862-5030
smichel@capdale.com