UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -   X

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| ) | 1:10-cr-00948-PKC |
| SUZANNE A. SEGGERMAN ) | |
|       Defendant. ) | |

- - - - - - - - - - - - - - - - - - -   X


**SUPPLEMENTAL MEMORANDUM ON BEHALF OF SUZANNE A. SEGGERMAN**
**IN AID OF SENTENCING**


                                             Attorney for the Defendant
                                             Russell M. Gioiella
                                             Litman, Asche & Gioiella, LLP
                                             666 Fifth Avenue, 17th Floor
                                             New York, New York 10103
                                             212.809.4500
                                             rmg@lagnyc.com

Of Counsel:

Scott D. Michel
Leila D. Carney
Caplin & Drysdale
One Thomas Circle NW
Suite 1100
Washington, DC 20005
202-862-5030
smichel@capdale.com
lcarney@capdale.com


Date: May 13, 2019

This Supplemental Sentencing Memorandum is respectfully submitted on behalf of Suzanne A. Seggerman, who is scheduled to be sentenced by the Court on May 23, 2019, at 11:00 a.m. upon her plea of guilty to one count of conspiracy to defraud the U.S. Internal Revenue Service pursuant to 18 U.S.C. §371 and two counts of willfully subscribing to a false individual tax return pursuant to 26 U.S.C. §7206(1).[1]

# I.
## INTRODUCTION

For the reasons discussed in this Memorandum, we respectfully request that the court sentence Ms. Seggerman to a term of probation with special conditions of community service. Both the original and the recently updated Presentence Investigation Reports recommend a sentence of probation, and we certainly concur with that recommendation. We otherwise have reviewed the Probation Office's updated Pre-Sentence Report and have no objections to it.

The defendant's original Sentencing Memorandum, filed September 4, 2014, together with the additional details furnished in this Supplemental Sentencing Memorandum, provide substantial support for leniency under the sentencing factors in 18 U.S.C. §3553(a), especially recognizing:

    i)    that Ms. Seggerman has accepted full responsibility for her conduct and has paid all income taxes, interest, and penalties as well as an "FBAR" penalty of $436,413;[2]

---

[1] This Memorandum is filed slightly less than two weeks prior to Ms. Seggerman's sentencing to allow Ms. Seggerman's counsel to review the updated Pre-Sentence Report. Our letter request for a brief extension of time has not yet been decided.

[2] Ms. Seggerman's income tax liability on the interest income which she failed to report was $48,053. Her payment to the IRS for this liability included penalties and interest. As discussed below, the bulk of the tax loss underlying the guidelines range as reflected in the pre-sentence report arises from the estate tax on the accounts inherited by her and her siblings that were not reported on the estate tax return filed after their father's death. The estate tax issue was not addressed in Ms. Seggerman's plea agreement.

2

ii) that from the very inception of this investigation ten years ago, Ms. Seggerman has cooperated extensively, truthfully, and without delay, after which her three siblings entered guilty pleas and in 2018, the Justice Department obtained the conviction of an attorney on nineteen counts of tax and conspiracy charges for which he is serving twenty months in prison based in part on her trial testimony; and

iii) that, although she has suffered a number of adverse consequences arising from her conduct and following her guilty plea in October 2010, and in the midst of family loss and her own ███████, Ms. Seggerman continues to devote her life to her community and family, as demonstrated in the attached, additional letters of support.

Moreover, as discussed and documented in our original sentencing memorandum and further below, a sentence of probation with community service conditions would be in keeping with sentences issued to similar offenders in cases involving unreported foreign accounts. The attached updated data demonstrates graphically that the great majority of similar offenders – with or without cooperation credit – received downward variances to a sentence of probation or confinement of less than six months. When viewed in the context of these sentences, Ms. Seggerman's extensive cooperation and impressive personal history lend particularly strong support for a sentence of probation with community service.

## II.
### THE PAST FIVE YEARS

The first subpoena in this matter was served in 2009, leading Ms. Seggerman to an immediate determination to accept responsibility and cooperate, and this was promptly conveyed to the Government. She submitted her original Sentencing Memorandum to

the Court in September 2014 prior to her original sentencing date. The Court delayed sentencing then and the case was transferred to this Court, which awaited the conclusion of the Michael Little case. Since her original sentencing submission, Ms. Seggerman has further shown her acceptance of responsibility and has continued to cooperate with the government, particularly in the case of Mr. Little. She has also exhibited continuing dedication to public service and to her family – and has endured difficulty and other hardship unrelated to this case.

### A. Cooperation

Ms. Seggerman's cooperation has been vital to the government's case against her, her siblings, other individuals, and the family's former financial advisor and attorney, Michael Little. As described in the original 5K1.1 letter submitted by the Government, and the defendant's Sentencing Memorandum of 2014, Ms. Seggerman's cooperation began with her prompt admission of her own guilt.

In January of 2010, within weeks of receiving her subpoena and before her entry of a guilty plea, Ms. Seggerman met with government representatives to proffer her cooperation. In the weeks that followed, she quickly provided evidence of her conduct to investigators, including searching for out-of-use machines and flash drives, and providing at least four computers that held documentation the government found to be useful.[3] Since that time, over the course of nearly ten years, she has assisted the government in interviews, phone calls, and extensive document and email review.

---

[3] As noted in the original Sentencing Memorandum of 2014, Suzanne regrets her impulsive attempt to delete approximately three emails upon receiving the subpoena. She promptly had a change of heart. She volunteered to the Government that she had deleted certain emails, recovered and produced them, and as the Government stated in its initial 5K1.1 letter, her "cooperation could hardly have been more timely." 5K1.1 Letter of August 28, 2014, p. 9.

4

- In 2010, she met with investigators on at least five separate dates (January 26, March 5, August 17, September 20, and October 14).

- In 2012, she spent an estimated fifty hours reviewing and authenticating emails for the government on multiple dates (September 25 and 28, October 1, 12 and 18, and November 26).

- She met with the lead Assistant U.S. Attorney and investigating agents on multiple occasions, including March 7, 2013, March 15, 2013, June 10, 2014, July 15, 2014, and May 14, 2015.

- In 2018, she prepared to testify in-person on five occasions: February 1 and 20, March 2 (by phone), 15, and 23. On March 21, 2018 she was on stand-by to testify.

Ms. Seggerman then testified in the trial of Michael Little over the course of two consecutive days: March 26 and 27, 2018. The Government's original 5K1.1 letter described Ms. Seggerman's cooperation as "proven to be reliable," "critical," and "very extensive."[4]

   1) <u>Siblings and Family</u>

Ms. Seggerman understood that her cooperation would mean providing information on many people close to her, namely her siblings and her mother. Although they may have felt betrayed at the time, Ms. Seggerman understood it was the right thing to do and the only way for her to make amends for her own misconduct. Ms. Seggerman's decision, and her encouragement of her siblings, undoubtedly played a role in her siblings' decisions to accept responsibility for their own actions.

Ms. Seggerman entered her plea in 2010, and became a primary source of information about her family, their accounts, and their continuing conduct. She provided details of overseas accounts at banks other than UBS; efforts to access overseas funds;

---

[4]  5K1.1 Letter of August 28, 2014, p. 9.

communications with third parties, including lawyers, accountants, and advisors. She also helped facilitate her mother's interview by the government. Ms. Seggerman fully committed from the beginning of the investigation to making a clean breast of it, and she was outspoken in encouraging her family to follow her lead.

By the close of 2013, three of her siblings agreed to plead guilty. Obviously, Ms. Seggerman's cooperation greatly damaged her relationships with them. When she first cooperated, her own tax loss figure (and sentencing range) was based on an estimated $48,000 of her personal unpaid income taxes (as noted earlier, the actual number was $48,053). Her basic offense level has risen substantially because, perhaps arising from her siblings' initial refusal to cooperate, the government added to the criminal tax loss, and possible restitution calculation, the amended estate tax return liability of $4,170,087.[5] In addition to obvious financial consequences, this took an extreme emotional toll on sibling relationships, especially in an environment where Ms. Seggerman was and still is coordinating the care for her elderly mother and her disabled sister Patricia.[6]

---

[5] The PSI Report recommends restitution in the amount of $4,218,140 based almost entirely on the estate tax loss. The Government and Defendant's counsel are in the process of determining the correct amount of restitution. In the event the Court imposes restitution on Ms. Seggerman beyond what she has already paid, she will comply with Court's order as quickly as she can given her financial circumstances, including, as recommended by the Probation Office, devoting a percentage of her income. She has also authorized her counsel to work with counsel for the other Seggerman siblings to gather the funds which remain under the control of the Swiss lawyer – the funds in trust for her disabled sister Patricia – for transfer to the U.S. so they can be used to whatever extent possible for payment of the estate tax liability; this effort is currently in process. (Her sister has other US funds available for her care in trust after her mother's death.)

[6] Ms. Seggerman is now working with her siblings, serving as principal liaison with her mother and Patricia, both suffering from mental illness, to safeguard their funds, some of which appear to have been stolen from them by care providers. Ms. Seggerman's participation in this ongoing investigation has been crucial as she is the sole child who has been in touch with her mother and Patricia regularly over the past ten years and has alone maintained her mother's trust.

While her cooperation resulted in an amount of pain to her family that her father could not have imagined, Ms. Seggerman is certain she has done the right thing. She continues to work towards restoring family relations, especially in light of ongoing struggles with the care of her mother and sister, who both face challenging medical and psychological struggles. She is the only sibling who has remained in contact continuously throughout this ongoing legal process and has been the only person able to convince her mother to seek the medical attention she needs well into her 80s (she turns 88 on May 13, 2019). Ms. Seggerman continues to play an important role as a go-between between her mother and her siblings.

2. Michael Little and Others

Of special significance in assisting the government, Ms. Seggerman provided substantial information during the government's investigation of Michael Little and the Swiss lawyer associated with this matter. While the Swiss lawyer has not to our knowledge been charged, the Government specifically noted the value of Ms. Seggerman's cooperation in its investigation of him in its original 5K1.1 letter; we understand this investigation may still be ongoing.[7] We also note that Ms. Seggerman helped the government by providing information about other individuals who were involved, such as an assistant of Michael Little and a U.S. based accountant recommended by Little.

Notably, in 2010, Ms. Seggerman informed the government of ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Throughout the next eight years she helped the government build its case and acted as an ongoing resource. As the

---

[7] 5K1.1 Letter of August 28, 2014, p. 5.

7

trial approached in 2018 she prepared to testify, making herself available for in-person witness preparation on five occasions (February 1 and 20, March 2 (by phone), 15 and 23). On March 21, 2018, she was on standby to testify. Most visibly, Ms. Seggerman's cooperation culminated in her testimony against Michael Little, and, we believe, aided the government in securing his conviction. On March 26 and March 27, 2018, she gave hours of clear and credible testimony before this Court, maintaining her poise and credibility under the defendant's pro se cross examination, which included questions about a number of sensitive matters.

In its original 5K1.1 motion, the Government pronounced that "Suzanne Seggerman's assistance was highly significant and exceedingly useful" in the investigation of Little.[8] We have not seen the second 5K1.1 letter in this matter at the time of the filing of this Memorandum but have reason to believe it will characterize Ms. Seggerman's cooperation in a similar manner, especially as it relates to the Michael Little investigation and trial.

### B. Caring for her Daughter and Stepchildren

Ms. Seggerman's first priority has continued to be her daughter, who found herself living without her father, Michael Meyer, (who remained in Kenya for work) at the age of twelve. After Ms. Seggerman and Tatiana moved back to New York City after a year in Kenya in 2014, ▮

---

[8]     *Id.,* p. 10.

▇ Ms. Seggerman decided to move outside Detroit for a year to give Tatiana some time outside the city and to ascertain where Tatiana might best thrive for high school. Once Tatiana's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, she enrolled in a boarding school in Boston. Ms. Seggerman remained in Detroit for financial reasons and sought out work in the non-profit sector. Her husband returned from Kenya to visit them every few months.

In 2016, Tatiana was the victim of bullying by her roommate at school, and Ms. Seggerman immediately moved to a Boston suburb, Dorchester, and found a home for them both until the school could provide a safe room away from the bully.[9] Ms. Seggerman has lived there since then, and is proud of Tatiana's intended graduation on the dean's list in June of 2019 and her plans for college in the fall. Meanwhile, Ms. Seggerman's husband recently finished his 5-year contract in Kenya and has returned to the US, where they are both happily living together near their daughter. He is currently looking for work while Ms. Seggerman continues her own. It has been terribly difficult for all three of them to live apart and they are glad finally to be reunited.

In the past five years, Ms. Seggerman also provided care and emotional support to her stepchildren, Brooke, Nick, and Mix. From the time of their marriage in 1998, Ms. Seggerman has embraced Mr. Meyer's kids as her own. Mr. Meyer's youngest son, who went by the name of Mix, was severely disabled. Ms. Seggerman went to great lengths to

---

[9] With her mother's support, Tatiana grew from this experience and became a Youth Ambassador for the International Bullying Prevention Association, publicly speaking out against bullying in front of children, doctors, teachers, lawyers, and police officers. Tatiana became an activist, and even published a graphic novel on the issue for Boston Children's Hospital (BCH) patients, following her mother's unique example of reaching out to children in a way that is appealing and accessible to them. Her talk as the only minor on a panel with professionals from BCH and the Harvard Medical School at the Justice Department's Anti-hate Conference was met with a standing ovation.

9

enable them to all spend time together as a family, as detailed in her original Sentencing Memorandum of 2014.

The greatest gift that Ms. Seggerman gave Mix was access to a meaningful profession. Because of her connections with the video game industry, she was able to put Mix in touch with his hero and idol - a writer and editor at Wired Magazine. This editor went on to give Mix an internship which later turned into a job, where Mix became an influential writer and blogger for Wired.com at the age of 19. Three years ago, Mix finally succumbed to his heart condition, dying at age 23, having lived as full a life as possible. His legions of fans poured out their heartfelt remembrances on social media - many of them had not known about his condition.

The loss of Mix was devastating to the entire family. Through this difficult time, Ms. Seggerman has acted as a stalwart presence for Mr. Meyer, who was heartbroken, and for Brooke, Nick, and Tatiana, who were bereft at Mix's death; ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. The older children have endured a volatile, if not tragic, response by their mother to Mix's death, who has at times lashed out at them, even violently. With Mr. Meyer working in Kenya, Ms. Seggerman has been instrumental in providing stability and love to a close family torn apart by loss. Through her dedication and family leadership, Ms. Seggerman has brought the family closer together, and notwithstanding their physical separation, they now spend most of their holidays together as a family of five.

### C. Work and Community Service

Finding paid work has been a necessity and a challenge for Ms. Seggerman in the wake of her very public guilty plea. All of Ms. Seggerman's inherited funds and her own

10

savings have been spent paying her income tax debt and penalties in full, including her FBAR penalty of $436,413, and her legal fees. ███████████████ ███████████████████████████████████████████,[10] so her family has relied on the income Ms. Seggerman received from renting her loft and on Mr. Meyer's income before his job ended in February of 2019. ████████████████ and the added cost of living separately from her husband have been a burden on the family's finances. Ms. Seggerman deeply regrets her misconduct, which has cost her savings, her career, and her ability to support her family. She is pleased to have repaid her income tax debt to the United States, with all penalties and interest.

The defendant's original sentencing memorandum described at length her founding and development of the non-profit "Games for Change." Although Ms. Seggerman dramatically reduced her role with the organization after her guilty plea, acting now primarily as an advisor, she continues to receive honors for her groundbreaking work associated with it. At the 2015 Annual Game Developers Conference of the HEVGA (Higher Education Video Game Association), she was given an award by academics associated with the study of video games, along with Dr. Mary Flanagan, Professor of Film and Media at Dartmouth College, and Dr. James Paul Gee, Professor of Literacy Studies at Arizona State University, for her groundbreaking work

---

[10] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

in "building the field" of using games for educational and humanitarian causes.[11] In 2018, Mayor Bill de Blasio of New York honored Ms. Seggerman and several colleagues when his office declared June 28 as "Games for Change Day" in a special ceremony at the Games for Change Festival, now in its 16th year.[12] Ms. Seggerman's commitment to her community is recognized wherever she goes.

Despite losing her job, which was her life's work, and the safety net of her savings, Ms. Seggerman has continued to work to improve the world around her. She has become interested in protecting the environment by getting people to compost their food scraps, avoiding waste and rotting food in the landfill. She works at farmers markets signing people up, and she goes door-to-door talking to people and sharing information about the benefits of composting. Ms. Seggerman plans to continue this line of work and someday hopes to return to public speaking about this important environmental cause. In 2017, she became a Boston Climate Ready leader, trained in understanding the potential effects of Climate Change on Boston. She gave a talk about composting at her local Dorchester library as a part of that program in 2018. She is also a board member of that library and helps with fundraising and kids' programming, and she volunteers for Last Hope K-9, an animal rescue organization, and for 826, a literacy non-profit that helps kids in lower-income neighborhoods. This dedication is a hallmark of her character.

As far as her own employment, she has been constrained from finding full time employment in the non-profit sector by her guilty plea and her illness, so she now earns some income also as a household manager for a mother of a friend of her daughter's,

---

[11] HEVGA issued a press release on March 9, 2015, naming Ms. Seggerman the "Building the Field" award recipient. (Exh. A).
[12] The Mayor's office presented Ms. Seggerman with a plaque signed by Mayor De Blasio declaring June 28, 2018, "Games for Change Day." (Exh. B).

running errands, overseeing utility appointments and household repairs, and light housekeeping. This is a far cry from her previous life as a public speaker and new media executive, but it helps pay the bills and gives her life purpose. She continues to hope that following her sentencing she can resume her career in pursuing projects for the betterment of her community.

### III.
### SENTENCING FACTORS

In determining Ms. Seggerman's sentence, we respectfully ask the Court to take into consideration Ms. Seggerman's conduct, dedication to public service, and extraordinary cooperation, and to consider sentences received by others who committed similar or even more egregious crimes. Of the seven factors set forth in 18 U.S.C. § 3553(a), we wish to take particular note of three, i) "the nature and circumstances of the offense and the history and characteristics of the defendant," ((a)(1)), ii) the applicable sentencing guidelines ((a)(4)), and iii) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" ((a)(7)).

**A. The Instant Offense and the Defendant's Character**

The facts and circumstances relating to the instant offense have been set forth in the updated pre-sentence investigation report and the Sentencing Memorandum of 2014 and will not be repeated in detail here. Ms. Seggerman takes full responsibility for her decision to agree with her siblings, mother, and their advisers to hide the existence of the offshore monies from the IRS and access funds using deceptive means. She deeply regrets her criminal conduct and she has cooperated extensively in the government's investigation of her, her family, and her advisors, contributing, we believe, to the guilty

13

pleas of her siblings and the conviction of attorney Michael Little in part on the strength of her testimony.

Ms. Seggerman recognizes that her offense was a serious one and that the Court must weigh the need for general deterrence in evaluating the 3553(a) factors. For her part, she has already suffered personally and professionally as a result of her misconduct, and she will not engage in criminal conduct again. Furthermore, despite her personal turmoil over the last ten years, Ms. Seggerman has shown the depth of character: caring for her stepson, Mix, through his death, her stepchildren Brooke and Nick, especially in their grief, and supporting her husband, raising her daughter, and continuing to reach out into her community to do good works. Ms. Seggerman's cooperation along with the other facts and circumstances discussed in this Supplemental Sentencing Memorandum and the Sentencing Memorandum of 2014, strongly urge leniency.

### B. Sentencing Guidelines

The defendant does not object to the sentencing guideline calculation as set forth in the updated Pre-Sentence Report, which is unchanged from the original. The Probation Office has determined that the Base Offense Level is 24. This is based on the tax loss found by the Probation Office to be between $2.5 million and $7 million dollars, comprised largely of tax due on the estate of Ms. Seggerman's father. (See paragraph 37 of original Pre-Sentence Report.) Ms. Seggerman would note with regard to this guideline calculation that the total amount of tax loss associated with Ms. Seggerman's individual income tax returns was $48,053. The overwhelming majority of the tax loss underlying the base offense level of over $2.5 million arises from the estate tax liability

as to Harry Seggerman's estate. Ms. Seggerman fully accepts her responsibility for the entire tax loss in this matter, including the estate tax loss.[13] She sought to pay off her individual income tax loss as soon as possible after her decision to plead, and that payment was then made and processed in August 2014.

### C. Avoiding Sentencing Disparity

This case is part of an aggressive ten-year old IRS/DOJ program to pursue tax offenders who have used offshore accounts to conceal funds from the IRS and avoid taxes. More than 100 individuals have been charged as a part of that program. Based on the public record to date, courts have sentenced at least 90 of these offenders.

We recognize that in federal sentencing every case stands on its own. We do believe it noteworthy that irrespective of whether the government filed a 5K1.1 letter in any of these cases, over half of these defendants have been sentenced to probation, sometimes with a combination of home confinement and/or community service. Moreover, over 97% of them of received a downward variance or no incarceration. Under section 3553(a)(7), it is entirely appropriate for the Court to look to sentences in similar cases and to note when those cases have consistently imposed sentences below the guidelines' suggestion including sentences of probation.

---

[13] As Ms. Seggerman's counsel, while we also agree with the inclusion of the estate tax in the potential guideline range, and we acknowledge that we may have incomplete knowledge, we are unaware of any other case during the last ten year campaign involving unreported offshore accounts in which the government has included the estate tax loss in the sentencing guideline calculation as done here.

15

A chart, attached as Exhibit C, provides information on the cases sentenced so far in the offshore enforcement program since 2009.[14] The summaries provide compelling evidence that the Courts have and are repeatedly granting significant variances from the guideline range; again, this is the case even in cases lacking a 5K1.1 motion from the government.

We included some examples of sentences in these types of offshore cases in the original sentencing memorandum (at pp. 13-14), and now add a few more where the Government filed a 5K1.1 motion for the Court's consideration:

- Vaibhav Dahake, District of New Jersey, Case No. 11-CR-42. Structured transfers of funds to an undisclosed foreign account. Cooperated against bank resulting in a 5K1.1 downward departure. Sentenced to 1 year of probation.

- Zvi Sperling, Central District of California, Case No. 13-CR-108. Evaded tax on over $4.4 million, hiding over $2 million in offshore accounts in Israel. Cooperated resulting in a 5K1.1 downward departure. Sentenced to 2 years' probation, 1200 hours of community service.

- Sanjay Sethi, District of New Jersey, Case No. 13-CR-10. Created sham Caymanian and BVI corporations to be listed as the nominal holder of his HSBC accounts containing approximately $4.7 million. Cooperated resulting in a 5K1.1 downward departure. Sentenced to 1 year of probation.

- Baruch Fogel, Central District of California, Case No. 14-cr-691. Created a sham corporation to be listed as the nominal holder of his Bank Hapoalim and Bank Leumi accounts containing over $8 million; engaged in false deduction schemes and false gift schemes to repatriate funds. Cooperated by providing information on these specific schemes, and provided extensive, credible testimony against his financial advisor who was convicted, resulting in a 5K1.1 downward departure. Sentenced to 2 years' probation.

---

[14] This chart was created based on a review of Justice Department press releases, media reports, and public websites tracking offshore prosecutions and results. The chart does not include sentences of promoters or enablers, such as foreign bank officials.

In this context, the particularities of Ms. Seggerman's case recommend leniency. The Government has detailed the value of her cooperation in its 5K1.1 letter, as having helped result in three guilty pleas and a conviction in a trial in which Ms. Seggerman testified. We also ask the Court to consider, in comparing Ms. Seggerman's case to other offenders, that she was the first in her family to cooperate, that she expressed her immediate regret and remorse in her actions to assist the investigation and urging her siblings to do the same, and that she has worked to rehabilitate herself, and paid a substantial FBAR penalty. Ms. Seggerman fully recognizes that these actions do not reduce her crime. We merely ask that they be considered when weighing her case against other tax law violators who have been sentenced to probation.

## IV.
### SUPPORT FROM FAMILY AND FRIENDS

Ms. Seggerman's family and friends have continued to reciprocate her love and dedication. Many letters of support have been addressed to the Court that illustrate the magnitude of Ms. Seggerman's continued commitment to them and how invaluable she is to her family and community.

Ms. Seggerman's husband, Michael Meyer, wrote a letter in 2014 that recounted his deep esteem for his wife. Five years later, his admiration for his wife as a source of strength to their family and a woman of strong moral fiber has only grown. He has again attempted to put into words the depth of his certainty that his wife has learned from her past failings and he respectfully requests leniency so that she can continue contributing to their family and community. (Exh. D).

Ms. Seggerman's daughter is about to graduate high school, and is able to reflect on her mother's love for her with uncommon perception. Despite Ms. Seggerman's

17

difficult relationship with her own unstable mother, Ms. Seggerman was able to build a strong and supportive relationship with her own daughter. In the letter set forth below in its entirety, Tatiana's own words best describe the remarkable mother Ms. Seggerman has been to her. (Exh. E).

Ms. Seggerman's stepdaughter, Brooke Meyer, has written a letter to emphasize the love and support that she has received from her "second mom" in recent years. She shares that her stepmother's compassionate care when she was in profound grief due to the loss of her brother, Mix, enabled her to recover and find purpose again. Ms. Seggerman's inspiring example and active encouragement led Brooke to undertake a career in public service; Ms. Seggerman's passion for improving the world is compelling. (Exh. F).

Ms. Seggerman's boss at ███████████, Jacilyn Spencer, was likewise moved to describe her dedication to the community. Ms. Spencer has been impressed by Ms. Seggerman's passionate and effectual work ethic in promoting composting, as she describes in her letter below (Exh. G).

Ms. Seggerman's friend and boss, ███████████, has requested the opportunity to describe Ms. Seggerman's commitment to her community. Even while she struggled with the personal stresses of this case, and ███████, Ms. Seggerman became a remarkable friend and employee for Ms. ███████, as set forth in her letter below. (Exh. H).

## V.
### CONCLUSION

Ms. Seggerman herself has written to the Court and her letter speaks for itself. (Exh. I). She acknowledges that she has committed a serious offense and understands and acknowledges the need for deterrence. But following her decision to admit guilt and cooperate, she has been awaiting her sentencing day now for nearly ten years, and during that time she has provided substantial assistance to the government on numerous fronts, worked hard to support her family and keep them together in the face of stress and even tragedy, and exhibited her continued dedication to friends and the community even in the face of a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ms. Seggerman has unceasingly contributed to her community, both on a global scale, through her work for Games for Change, and on a personal level, by going door-to-door to explain the environmental benefits of composting, to take just one example. Throughout her life, friends and family have recognized her warm heart and passion for helping those around her.

Especially in light of the manner in which dozens of other courts have addressed sentencing issues in cases involving unreported foreign accounts, we respectfully submit that taking all of these factors into account under section 3553(a), the Court sentence Ms. Seggerman to probation with special conditions of community service.

Respectfully submitted,

S/ Russell M. Gioiella_____
Russell M. Gioiella
Litman, Asche & Gioiella, LLP
140 Broadway, 38th Floor
New York, New York 10005
212.809.4500
rmg@lagnyc.com

Attorney for the Defendant

Of Counsel:

Scott D. Michel
Leila D. Carney
Caplin & Drysdale
One Thomas Circle NW
Suite 1100
Washington, DC 20005
202-862-5030
smichel@capdale.com
lcarney@capdale.com